IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

R.V. YOUNG,                    )
                              )
        Petitioner,           )
                              )
v.                             )     **Case No. 2:03-0040**
                              )     **Judge Trauger**
UNITED STATES OF AMERICA,    )
                              )
        Respondent.       )
                              )

## MEMORANDUM

Pending before the court is Magistrate Judge Brown's Report and Recommendation ("R&R") (Docket No. 189), which makes a recommendation as to the disposition of the Government's pending Motion to Dismiss (Docket No. 166). Both the petitioner, R.V. Young, and the Government have filed objections to the R&R. Young's objections as to two issues are well taken, and, in light of that, the court will schedule an evidentiary hearing on those two issues. As discussed herein, in light of the court's other findings, it is not necessary to resolve the issues raised in the Government's limited objection to the R&R.

## FACTUAL AND PROCEDURAL BACKGROUND

The protracted procedural history of this case was thoroughly addressed by Magistrate Judge Brown in the R&R, and, therefore, it is not necessary to fully recount that history. (See Docket No. 189 at 1-3.) By way of a brief review, in February 2000, Young was indicted for a string of five armed bank robberies that occurred in this district in late 1997 and early 1998.

1

(Crim. Docket No. 1.)[1]  After a three-day jury trial in this court in July 2000, Young was

convicted on all counts and subsequently sentenced to ninety-two years in prison.  After his

direct appeal to the Sixth Circuit was denied (and the deadline to seek a writ of certiorari from

the Supreme Court passed), Young filed this 28 U.S.C. § 2255 (*habeas corpus*) action *pro se* on

April 23, 2003.  (Docket No. 1.)  Thereafter, Young was appointed counsel, and, on October 4,

2004, he filed an Amended and Supplemental Petition, which alleged several claims.  (Docket

No. 34.)  After lengthy delays involving issues that are not directly germane to the present

proceedings, on July 31, 2008, the Government filed its Motion to Dismiss Young's Petition

under Federal Rule of Civil Procedure 12(b)(6).  Young, after receiving an extension, filed his

response on December 5, 2008, and the matter was referred to Magistrate Judge Brown.

Judge Brown correctly determined that, because both parties had filed materials outside

of the pleadings, the Government's Motion to Dismiss should be construed as a Motion for

Summary Judgment.[2]  (Docket No. 189 at 4)  In a forty-eight page opinion, Judge Brown

analyzed each of Young's arguments and determined that Young had procedurally defaulted as

to all but two claims from his Amended Petition, that is, his claim to ineffective assistance of

counsel and his *Brady* claim, the latter of which alleges that the Government suppressed key

evidence that would have been highly beneficial to Young at the initial trial.  As to those

remaining claims, Judge Brown recommended that the Government's motion be granted and that

---

[1]"Crim. Docket" refers to the underlying criminal case in this court, Case No. 2:00-00002.

[2] Both parties argue that the summary judgment standard should apply and, clearly, both parties have had the necessary "reasonable opportunity" to present evidence pertinent to the motion.  (Docket No. 196 at 1; Docket No 199 at 3; Fed. R. Civ. P. 12(d)).

the action be dismissed with prejudice. (Docket No. 189 at 47-48.)

The Government filed a timely objection to the R&R, asserting that Judge Brown misspoke as to certain points of law, and, therefore, this court should correct the R&R to properly reflect the law. (Docket No. 191.) After receiving an extension of time, Young filed his objections to the R&R, making specific objections to Judge Brown's findings on the ineffective assistance of counsel claim and the *Brady* claim. (Docket No. 196.) Young did not challenge Judge Brown's conclusions regarding procedural default.

## ANALYSIS

### I. Standard of Review

Under Federal Rule of Civil Procedure 72(b) and 28 U.S.C. § 636(b)(1), the court is required to make a *de novo* determination of any part of the Magistrate Judge's R&R to which specific objection has been made. The district judge may accept, reject, or modify the recommended disposition, receive further evidence, or return the matter to the magistrate judge with instructions. Fed. R. Civ. P. 72(b)(3).

Here, the Government has moved for a summary dismissal of Young's *habeas* petition; that is, the Government asks the court to dismiss Young's Petition without an evidentiary hearing. In determining whether summary judgment is appropriate in a *habeas* proceeding, the court applies the ordinary rules governing summary judgments under Federal Rule of Civil Procedure 56. *See Moore v. Howes*, 2009 WL 722698, *6 (E.D. Mich. March 17, 2009).

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there

3

is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). To prevail, the moving party must meet the burden of proving the absence of a genuine issue of material fact as to an essential element of the opposing party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001).

In determining whether the moving party has met its burden, the court must view the factual evidence and draw all reasonable inferences in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *McLean v. 988011 Ontario, Ltd*., 224 F.3d 797, 800 (6th Cir. 2000). "The court's function is not to weigh the evidence and determine the truth of the matters asserted, 'but to determine whether there is a genuine issue for trial.'" *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

If the non-moving party fails to make a sufficient showing on an essential element of the case with respect to which she has the burden, however, the moving party is entitled to summary judgment as a matter of law. *See Williams v. Ford Motor Co.*, 187 F.3d 533, 537-38 (6th Cir. 1999). To preclude summary judgment, the non-moving party "must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial." *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 566 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 252). If the

4

evidence offered by the non-moving party is "merely colorable," or "not significantly probative," or not enough to lead a fair-minded jury to find for the non-moving party, the motion for summary judgment should be granted. *Anderson*, 477 U.S. at 249-52. "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Hill v. White*, 190 F.3d 427, 431 (6th Cir. 1999) (citing *Anderson*, 477 U.S. at 247-49).

In a *habeas* proceeding, if the petitioner has raised a genuine issue of material fact in support of one or more of his claims, the appropriate next step is for the court to set an evidentiary hearing on those claims. *See Blackledge v. Allison*, 431 U.S. 63, 80-81 (1977); *Groke v. Trombley*, 2002 WL 418014, *1 (E.D. Mich. Mar. 18, 2002) ("a federal district court should not enter a summary judgment in a *habeas* case if the pleadings or papers present a genuine issue of fact.")

## II.    Judge Brown's R&R

The R&R discusses Young's two remaining claims, that is, his ineffective assistance of counsel claim and his *Brady* claim. The court will discuss each one in turn, before turning to the Government's more limited objection to the R&R.

### A.    Ineffective Assistance of Counsel

Judge Brown correctly stated the legal standard for an ineffective assistance of counsel claim. To prevail on a claim of ineffective assistance of counsel, the petitioner must show deficient performance and prejudice. *Bell v. Cone*, 535 U.S. 685, 694-95 (2002). Trial counsel's

5

performance is deficient when it falls "below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 688 (1984). The prejudice element requires that the petitioner show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. "The determinative issue is not whether petitioner's counsel was ineffective but whether he was so throughly ineffective that defeat was snatched from the jaws of victory." *West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996) (internal quotation omitted).

As discussed in the R&R, Young's ineffective assistance of counsel claim contained more than twenty arguments as to why the representation he received from his trial counsel, Joseph Edwards and Michael Knowlton, was constitutionally deficient. Further, the briefing of the Government's motion showed a clear and stark difference of opinion between the client, Young, and his counsel, Edwards and Knowlton, as to how the representation was conducted at the trial level.

In support of the Government's motion, Edwards and Knowlton submitted affidavits in which they contend that they represented Young with great diligence, but, "at some point" prior to trial, Young recanted on his previous protestations of innocence and confessed to Edwards that he had committed three of the five bank robberies. (Docket No. 168 at 2; Docket No. 169 at 3.) Knowlton states that Edwards told him of this confession sometime after August 11, 1999, which was the date of a police lineup during which Young's voice was identified by two bank tellers as being that of the robber. (Docket No. 169 at 3.) Specifically, Edwards and Knowlton

6

agree that Young confessed to the December 19, 1997 Union Planters Bank robbery and the March 11, 1998 Regions Bank robbery. (*Id.*) Knowlton cannot recall "with certainty" the third robbery to which Young allegedly confessed, but he defers to Edwards's recollection that it was the January 16, 1998 Bank of Putham County robbery. (*Id.*) According to Edwards and Knowlton, Young did not confess to the other two robberies with which he was charged, that is, the White County Bank robbery on March 26, 1998 and the First Tennessee Bank robbery on February 17, 1998. (*Id.*)

Young, in his affidavit, could hardly paint a starker contrast. Young contends that he never confessed to any of the robberies to his counsel, that he never had an opportunity to establish any meaningful relationship with counsel, and that counsel failed to discuss discovery with him and failed to keep him advised of basic trial strategy. (Docket No. 180 Ex. A.) Young denies any involvement in the five bank robberies for which he was convicted and contends that counsel repeatedly ignored his requests to put on certain types of evidence, including alibi and witness identification evidence that would, in his view, have been very helpful to his case. (*Id.*)

At the outset of his discussion of the ineffective assistance of counsel claim, Judge Brown noted this factual dispute and stated that "the movant's affidavit establishes a genuine issue of material fact that would warrant an evidentiary hearing. As will be seen, however, the undersigned's analysis of the movant's claims does not rely on whether or not the movant admitted his involvement in any of the robberies." (Docket No. 189 at 4.) Judge Brown then analyzed Young's arguments regarding ineffective assistance of counsel and found none of them to have merit, even recognizing the fact issue as to whether Young had confessed to his

7

attorneys.  (*See e.g. id.* at 13-14.)

On the ineffective assistance of counsel issue, Young objects to the R&R on four primary grounds, arguing (1) that Judge Brown should have considered whether the factual dispute regarding the alleged confession was relevant to Young's success on the ineffective assistance of counsel claim (Docket No. 196 at 3); (2) that Judge Brown incorrectly found that Young was not prejudiced by counsel's failure to interview a number of witnesses to the robberies (*Id.* at 6); (3) that Judge Brown incorrectly found that Young was not prejudiced by counsel's failure to fully investigate and put on testimony of Young's alibi witness (*Id.* at 10); and (4) that Judge Brown incorrectly found that counsel's failure to investigate and call several lay witnesses on various identification issues was not ineffective assistance.  (*Id.* at 12).[3]

## 1.    The confession

As discussed above, Judge Brown noted that Young's claim that he did not confess to his

_____

[3] Young also states that he "stand[s] on [his] original arguments" as to the other ineffective assistance of counsel claims raised in the Amended Petition, that is, he disagrees with Judge Brown's findings on the other ineffective assistance of counsel claims made in the Amended Petition, but he does not provide specific objections.  (*Id.* at 12.)  It is well-settled that such general, sweeping objections to the findings in an R&R are not valid and need not be considered.  *See Spencer v. Bouchard*, 449 F.3d 721, 725 (6th Cir. 2006)("objections disput[ing] the correctness of the magistrate's recommendation but fail[ing] to specify the findings ... believed [to be] in error are too general.")(internal quotation omitted).  Young also claimed that Judge Brown erred in his conclusion that it was not ineffective assistance for Young's counsel to fail to challenge Agent Whitten's ability to testify as to certain visual comparisons Whitten made between materials the robber was photographed with during the robberies and materials found on Young's property and person, such as a shirt and boots, without qualifying as an expert under *Daubert*.  (Docket No. 189 at 30-31; Docket No. 196 at 10-11.)  The court agrees with Judge Brown's conclusion that the basic, optical comparisons that Agent Whitten testified to were "scarcely the stuff of science" to which the expert qualification rules apply.  (Docket No. 189 at 31.)

attorneys would have established "a genuine issue of material fact that would warrant an evidentiary hearing" if not for other weaknesses in Young's claims. (Docket No. 189 at 4.) Concluding that the competing affidavits raised a potential fact issue, Judge Brown went on to conclude that, even if Young could establish that there was no confession, he still could not establish ineffective assistance of counsel either (1) because on certain issues (such as the *Daubert* challenges discussed in the note above) counsel still behaved reasonably as a matter of law, or (2) because on certain issues Young could not raise a fact issue as to whether any professional failing was prejudicial, in light of the evidence presented against Young at trial.

In his R&R objection, Young contends that counsel's failure to interview witnesses, present alibi testimony, and present certain lay witnesses was unreasonable and prejudicial, and, he notes, that counsel relies, in part, on Young's alleged confession as their basis for any perceived failures in those areas. (See *e.g.* Docket No. 168 at 9, 13-14.). That is, counsel contends that they diligently represented Young and kept him well apprised of the status of his case and the evidence against him. However, counsel also believed that it would be unethical to put forth testimony that attempted to establish that Young did not commit these robberies when it was known to them that Young did, in fact, commit the robberies, and counsel contends that they informed Young that they could not ethically offer false testimony to the court. (*See e.g.* Docket No. 169 at 5-6.) Therefore, it is clear that the "confession" issue is interrelated with the other issues raised in the objections to the R&R, and the most effective way to deal with this objection is in the context of Young's other objections.

## 2. The alibi

In his motion response, Young submitted an affidavit from Donald ("Donnie") Richards, who stated that he has known Young in a "business context" for about twenty-five years, that is, he used Young (who was a horse trainer) to train horses and, from time to time, to drive goats to other states for him. (Docket No. 180 Ex. B.) In relevant part, Richards states in his affidavit, "before the trial of Mr. Young on bank robbery charges I spoke to [attorney] Edwards once or twice. I gave Mr. Edwards a trip sheet and a set of receipts that placed Mr. Young in another state at the time of one of the robberies [the March 11, 1998 Regions Bank robbery] that Mr. Young was charged [with]. I was told I would testify at the trial of the case and was willing to testify that the receipts and the trip sheet were directly related to a trip that Mr. Young took for me to deliver goats. I arrived in Nashville [from Sparta, Tennessee about 95 miles away] for the trial of Mr. Young and came back and forth for three consecutive days. I was never called to testify during the trial. I believe that my testimony could have assisted Mr. Young in that *I could have placed Mr. Young in another State on a delivery run during one of the bank robberies.* I have no explanation of why Mr. Edwards would not use me as a witness. Mr. Edwards never explained to me the reason for not calling me." (*Id.*)(emphasis added).

In the R&R, Judge Brown first examined how this affidavit affected the "unreasonable conduct" portion of the "ineffective assistance of counsel" claim. (Docket No. 189 at 13.) Judge Brown noted that counsel's affidavits stated that they did explore the alibi claim and found it to be an unavailing path because (1) the trip receipts did not identify who made the trip; and (2) at the time of trial, Richards advised them that he did not think Young had made the March 11 trip. (Docket No. 189 at 13.) In their affidavits, counsel also state that they knew, from Young's

10

confession to them, that Young had committed the Regions Bank robbery, and, therefore, they did not feel that they could ethically put Richards on the stand to testify to something that they knew could not have happened.[4]  (See Docket No. 168 at 13.)

Judge Brown recognized that the disputes between Richards/Young and Edwards/Knowlton created a fact issue as to whether, on the alibi issue, counsels' conduct was unreasonable under the legal standard noted above.  (Docket No. 189 at 13.)  That is, a reasonable fact finder could conclude that it would fall below the "objective standard of reasonableness" for counsel to ignore viable alibi testimony based upon an unsupported certainty as to their client's guilt.  Indeed, neither side disputes this point.  Judge Brown then turned to whether Young had sufficiently demonstrated that he was prejudiced by the failure to call Richards.

Judge Brown concluded that Young could not show such prejudice, stating, "The question of prejudice boils down to this.  Is there a reasonable probability that the jury would have decided the movant's guilt or innocence of the March 11, 1998 robbery of the Regions Bank differently if Richards had testified in June [actually July] 2000, given that 1) Richards

---

[4] As to why he went through the charade of subpoenaing Richards for trial and having Richards travel about 95 miles to and from court each day of the trial, Edwards explains that "Young was slow to accept that this evidence could not be used to establish an alibi for a bank robbery that he had admitted to me he committed."  (Docket No. 168 at 5.)  In his affidavit, Young replies, "I am not as slow as Joe Edwards suggests.  If I had confessed to him of robbing the banks I would have easily grasped the point that an alibi witness could not have been put on the stand to testify that something did not happen the commission of which I had admitted.  The fact is that I never admitted robbing the banks and Donnie Richards will testify that I was prepared to testify at the trial that I was in another state at the time of the Regions Bank robbery."  (Docket No. 180 Ex. A.)

would have testified more than two years after the trip at issue; (2) there was nothing on the receipts that linked the movant to the trip; (3) the receipts were kept in a cardboard box with all of the other trip receipts for 1998; (4) the movant was not the only driver who delivered livestock for Richards; (5) the movant had made '15 to 20 trips ... to various places to deliver or pick up livestock' for Richards; (6) there was no cause to question who made the March 11, 1998 [trip] until after the movant was identified for the Regions Bank robbery on August 11, 1999 – seventeen months, and numerous deliveries, after the fact. Or would the jury have, in the absence of any evidence to corroborate Richards' memory of events under the circumstances described, credited the substantial evidence, discussed *infra*, that established the movant's identi[t]y as the Regions Bank robber." (Docket No. 189 at 13-14.) After posing this question, Judge Brown concluded that, even if Richards had testified, "there was not a reasonable probability that the jury would have decided the question of guilt or innocence differently. Accordingly, the movant has failed to establish that he was prejudiced because Richards was not called to testify." (*Id.* at 14.)

Young objected to this conclusion, citing Richards's affidavit and arguing that there was a clear fact issue that warranted an evidentiary hearing. (Docket No. 196 at 9.) After a review of the trial record, the court agrees. That is, the court, after reviewing the full trial record in the context of its own memory of this trial, does not view the evidence against the defendant in this case as so overwhelming that the firm, convinced testimony of an alibi witness with little apparent bias could not have legitimately raised a reasonable doubt in the jury's mind as to

12

whether Young had robbed the Regions Bank.[5]

The Regions Bank robbery was a central focus at trial. The prosecution presented evidence from two tellers present during the Regions Bank robbery who, in an August 11, 1999 line-up, identified Mr. Young's voice as that of the robber. (See Crim. Docket 71 at 19-20.) Further, the Regions Bank robbery produced what was perhaps the single most compelling piece of evidence against Young; that is, William Frensley, an FBI photographic evidence examiner, testified that he compared the surveillance photos from the Regions Bank robbery to evidence recovered from Mr. Young's horse barn, and that he was able to determine that the coveralls worn by the Regions Bank robber were the same coveralls found in the horse barn, because they both had the same unique bleach stain. (Crim. Docket No. 71 at 17.)

Other than that testimony, the Government's case rested largely on the rough similarities between materials recovered from Young (shirt, stocking, gun, and boots) and those same items depicted in robbery surveillance photos, the similarities between the five robberies themselves, and the rough similarities between the five robberies and the robbery of a Cash Express store in August 1998, which Mr. Young had admitted committing. There was little visual identification testimony offered at trial, because the robber of the five banks at issue always wore a stocking over his head during the robberies, and, therefore, it was difficult for eyewitnesses to make a

_____

[5] In its reply, the Government notes that Richards's affidavit states that he was "willing" to testify to Young's whereabouts on March 11, 1998, but that proposition could be read to mean that Richards was willing to be dishonest about Young's whereabouts. (Docket No. 199 at 4.) The essence of the sworn statement is that Richards knows that Young was not in the state on the date of the robbery; that is, there is nothing to suggest that Richards is not being truthful, in form and substance, in his affidavit testimony.

13

firm visual identification of Young as the robber. (See Crim. Docket No. 71 at 20.) That said, the prosecution did offer testimony that the robber had roughly the same physical features (height, weight, walking style) as Young. Again, to the court, the only potential "smoking gun" evidence of Young's guilt for all of the robberies was Frensley's testimony about the coveralls. Even that evidence, however, was not beyond legitimate questioning. From the testimony adduced at trial, for instance, it is clear that the horse barn was not a secure area. (Crim. Docket No. 53 at 268.) Further, certain evidence, such as the "Tennessee Volunteers" hat, the "Texaco" hat, and the yellow rain slicker that the robber is depicted as wearing in certain surveillance photos were not located on Young's property.

There is at least a fact issue as whether Richards's testimony that Young was not in the state on the day of the Regions Bank robbery would have further weakened the power of Frenley's testimony (and the other evidence), to the point where there was a reasonable doubt as to whether Young committed the Regions Bank robbery. While Judge Brown raised cogent concerns about the ability of Richards to remember *for sure* that it was Young who took the trip, those credibility concerns are not very different from the type found in any similar witness, and, further, Richards's testimony would have been at least as compelling as that of the bank tellers who claimed to identify Young by voice some seventeen months after the robbery took place. Further, while Richards and Young were business acquaintances, there is little to suggest that Richards had any obvious bias in favor of Young that would have falsely colored his testimony then or now. Therefore, the court concludes that there is a fact issue as to whether Young was prejudiced by the fact that this alibi testimony was not presented.

14

The court also notes that this potential prejudice extends not just to the Regions Bank robbery conviction, but to Young's convictions for the other four bank robberies. The Government repeatedly argued during trial and closing argument that the similarities between the robberies meant that the same person must have committed all five robberies and this meant that if the jury could conclude that Young robbed one of the banks then they should find Young guilty on all five robberies. Indeed, as the Government noted during closing, "the United States submits you may conclude ... that the defendant is the person who robbed Regions Bank and therefore the person who robbed these other four banks." (Crim. Docket No. 71 at 20.)

Therefore, the court concludes that there must be an evidentiary hearing as to whether counsel behaved unreasonably as to the potential alibi witness, and, if so, whether Young was prejudiced by that unprofessional behavior.

### 2. Eyewitnesses

Young contends that his attorneys were constitutionally deficient because they did not conduct interviews with bank tellers and other witnesses to the robberies. (Docket No. 189 at 7.) It is undisputed that counsel did interview, at least to some extent, one teller and that counsel at least talked to the two tellers who identified Young by voice as the Regions Bank robber. (*Id*.) In his R&R, Judge Brown assumed, for the sake of argument, that counsel had been unreasonable in its failure to conduct more witness interviews but concluded that "the movant has made no effort whatsoever to show that/or how he was prejudiced." (*Id.* at 8.)

In his R&R objections, Young argues that seventeen bank employee eyewitnesses were called at trial, and the failure to speak with more than three of those witnesses during counsel's

15

investigation was unreasonable. (Docket No. 196 at 4-6.) Again, this is the point Judge Brown assumed for the sake of argument, and the Government does not challenge that some abject failure to interview witnesses might, under certain circumstances, "fall below an objective standard of reasonableness." Again, the issue for present purposes is prejudice.

Young contends that the prejudice is "evident." (*Id.* at 6.) Young points to various statements made by eyewitnesses at trial, in *Jencks* statements and in *habeas* discovery that indicate some inconsistencies between the eyewitnesses as to what they saw, and potentially challenge, in certain cases, the notion that the individual they saw approaching the bank (before the stocking "mask" was put on) was Young based on what he was wearing and his facial features. (*Id.* at 7.)

The court concludes that Judge Brown correctly evaluated this issue. As is clear from the trial record and the seventeen eyewitnesses who testified, visual witness eye identification was of minuscule importance in this trial. The testimony revealed that few witnesses got a "good look" at the robber, because he was wearing a stocking over his head during the robberies, and, in the few instances where the robber was seen by a witness prior to entering the bank, those looks were relatively fleeting. Obviously, with so many witnesses seeing the robber for such a brief time and in such a period of stress, witness recollections as to what exactly he looked like and what color his coveralls were and similar observations were going to contain discrepancies, and, indeed, some of those discrepancies were mentioned at trial. (Crim. Docket 52 at 102)(bank teller witness from Putham County Bank robbery stated that the robber was a heavyset man in his '30s, which is not consistent with a description of Young.) In light of the evidence adduced

16

at trial, it would be unreasonable of this court to conclude that further in-person attorney interviews of the witnesses to the bank robberies could have so turned the tide of this case such that there is "a reasonable probability" that the outcome of this case would have been different. Therefore, Young's objection on this point is without merit.

### 3. Additional lay witness testimony

Young also contends that Judge Brown incorrectly found that it was not ineffective assistance for Young's counsel to fail to interview and then call several close relatives and relations of Young who, Young claims, could have "rebutted the damaging testimony of Donna Goss." (Docket No. 196 at 11.) Donna Goss was Young's former long-term girlfriend, and she had an apparently unpleasant break-up with Young, which Young initiated, several years prior to the trial. At the trial, Goss testified that, based on her familiarity with Young, she could tell that the person masked by the stocking on the bank surveillance tape from two of the robberies (Regions Bank and First Tennessee) was likely Mr. Young. (Crim. Docket No. 53 at 256-65.) She based that testimony on her familiarity with Young's face, his hands, his gait, his clothes, and his hat. (*Id.*) Specifically, she testified that she recognized the stained coveralls from the Regions Bank surveillance video as similar to the ones that Young wore. (*Id.*) Edwards cross-examined Goss on her potential biases and challenged the overall value of her testimony. (*Id.* at 265-78.)

In their affidavits, Edwards and Knowlton claim that it was not unreasonable for them to not call any witnesses to challenge Goss's testimony because: (1) it would have been unethical to challenge Goss's identification based on the Regions Bank surveillance tape because they knew

17

Young had committed the Regions Bank robbery; (2) as to the First Tennessee robbery (which Young had not allegedly confessed to) the only witnesses who could challenge Goss's testimony were "intimate friends or family members" of Young, who supposedly would have had an "obvious bias in his favor;" and (3) Goss was not a particularly compelling witness so there was little need to call further witnesses to rebut her testimony. (See Docket No. 168 at 14.)

In response, Young put forth affidavits from his fiancee, his mother, and his son, all of whom stated that they could have offered testimony that would have painted Young as a well-kept person who would never have worn stained clothes and did not own certain articles of clothing that appeared in the Regions Bank surveillance video, such as an orange baseball cap. (Docket No. 180 Exs. C-E.) These affidavits also state that Edwards and Knowlton were dismissive of Young's family members and the help that they could provide; for instance, Young's fiancee (Judy Radford) provided an affidavit in which she stated that she repeatedly attempted to call Edwards to discuss the case, but Edwards always rebuffed her efforts to help, stating that he did his own investigation and that Radford would be impressed once she saw him in court. (Docket No. 180 Ex. C.) Young's son also stated that he tried to reach Edwards with information about the case, but Edwards never returned his calls. (Docket No. 180 Ex. E.) All three affidavits state, in essence, that counsel was exceptionally dismissive of Young's closest relations, despite their offerings to help with potentially valuable information.

Judge Brown concluded that Young could not raise a fact issue as to unreasonable conduct or prejudice. (Docket No. 189 at 16.) Again looking past the confession issue, Judge Brown concluded that Edwards and Knowlton had provided a "tactical reason" for their decision

18

not to call the witnesses (potential bias) and the affidavits speak merely "in generalities about the movant's appearance and grooming habits, they do not address themselves to the security photos or testimony at issue." (Docket No. 189 at 16.) Young objected, arguing that this testimony would have rebutted Goss and various bank tellers who, in their brief opportunities to view the robber before he put on his stocking, described the person as scruffy and having sideburns. (Docket No. 196 at 11-12.)

To the court, there is a legitimate factual dispute about the reasonableness of counsel's conduct here. While counsel's "tactical" decisions, even those that appear dubious in hindsight, are afforded great deference and "are particularly difficult to attack," the decision to ignore potential witnesses with potentially helpful information on the simple assumption that those witnesses are "biased," which is the allegation that Young has advanced, cannot fairly be considered a "tactical decision." *See Swatzell v. Lewis*, 79 Fed. Appx. 165, 167 (6th Cir. 2003). Therefore, there is a genuine issue of fact as to whether Edwards and Knowlton acted reasonably in regards to these witnesses.

The next question is whether there is a fact issue as to whether Young was prejudiced by the fact that these witnesses did not testify as trial. Briefly addressing the prejudice issue, Judge Brown concluded that, "although the affidavits speak in generalities about the movant's appearance and grooming habits, they do not address themselves to the security photos or testimony at issue. More critically, the affiants do not assert that the security photographs at issue are not the movant." (Docket No. 189 at 16.)

This is a mischaracterization of the material in the affidavits, significant portions of

which directly challenge materials on the security photos.  For instance, Ms. Radford stated that, despite being intimately familiar with Young's wardrobe at the time of the robberies, "I have never known [him] to possess or wear an orange baseball cap."  (Docket No. 180 Ex. C.)  The surveillance photos from the Regions Bank robbery plainly show that the robber was wearing a brightly colored, Tennessee Volunteers baseball cap.  (See Docket No. 63.)  Further, Ms. Radford states that she never saw a pair of stained coveralls (like the ones depicted in the Regions Bank robbery) in Young's possession, and, further, Young would have been unlikely to keep such a pair of coveralls in his possession because of his meticulous nature and borderline obsession with cleanliness and order.  (Docket No. 180 Ex. C.)  Young's mother and son, who were also well acquainted with his wardrobe, offered similar statements in their affidavits; indeed, Young's son, Randy, states that he worked with his father at the horse stables on a "daily basis" and, while his father wore coveralls at work, he never saw his father wear a pair with anything resembling the bleach stain depicted in the Regions Bank photos. (Docket No. 180 Exs. D-E.)

After reviewing the trial record, the court concludes that Young has brought forth enough evidence to raise a fact issue as to prejudice.  It must be remembered that no defense was put on by Young at trial; the jury never heard from anyone on Young's behalf.  Instead, they heard three days of testimony from emotionally damaged bank employees, a jilted ex-lover, government agents, who, with varying degrees of convincingness, pointed the finger at Young, and individuals associated with the Cash Express robbery.  Again, other than the "coverall match" from the Regions Bank robbery, there was nothing resembling a  "smoking gun."  In

20

light of this, it is certainly reasonable to assume that three witnesses, all of whom were well acquainted with Young and who could speak about him positively and with knowledge, could have turned the tide in this case, particularly given the testimony that Young did not own a pair of coveralls like those depicted in the Regions Bank surveillance photo and that Young did not own an orange cap like that depicted in the Regions Bank photo. A reasonable fact-finder could conclude that, if this testimony had been presented, there is a "reasonable probability" that the final result would have been different.[6]

Therefore, the court concludes that there must be an evidentiary hearing as to whether counsel behaved unreasonably as to these potential lay witnesses, and, if so, whether Young was prejudiced by that unprofessional behavior.

### B.    *Brady* Claims

The R&R identifies four pieces of evidence (all pertaining to the Regions Bank robbery) that Young argues were wrongfully withheld by the Government in violation of his Fifth Amendment rights embodied in the doctrine outlined in *Brady v. Maryland.* They are: (1) the existence of an unidentified gray-haired man, not Young, who sought change for a large denomination bill at a bank near the Regions Bank shortly before the Regions Bank was robbed; (2) statements from witnesses to the Regions Bank robbery that the robber had long or bushy gray sideburns; (3) reports that the tellers from the Regions Bank robbery were exposed to media

---

[6]The potential prejudice is only heightened considering the strength of the defense case had the alibi testimony been offered as well.  *See Campbell v. U.S.*, 364 F.3d 727, 736 (6th Cir. 2004)(acknowledging potential that "cumulative" effect of several instances of ineffective assistance might dictate reversal).

Case 2:03-cv-00040   Document 203   Filed 07/02/09   Page 21 of 32 PageID #: 1195

coverage pertaining to the robber prior to the August 11, 1999 line-up; and (4) the statement of a witness to the Regions Bank robbery that the robber was armed with a .357 caliber revolver with a red dot on the front sight.  (Docket No. 189 at 43.)

The legal standard pertaining to a *Brady* claim was accurately set out  in the R&R. "[S]uppression by the prosecution of evidence favorable to an accused ... violates due process where the evidence is material either to guilt or to punishment ... ."  *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  There are three elements that must be shown to establish a *Brady* violation: (1) the evidence at issue must be favorable to the accused because it is either exculpatory or impeaching; (2) the evidence must have been suppressed by the government, either willfully or inadvertently; and (3) prejudice to the defendant must have ensued.  *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).  Again, as with the ineffective assistance of counsel claim, showing prejudice is a considerable burden, that is, the defendant must be able to show a "reasonable probability" that the result would have been different had the evidence not been suppressed. *U.S. v. Ross*, 245 F.3d 577, 584 (6th Cir. 2001). Reasonable probability has the same meaning in this context as it did in the ineffective assistance of counsel context.  *Id.*   To determine whether there was prejudice, the court must consider the effect of the suppressed evidence collectively, not "item by item."  *Schledwitz v. U.S.*, 169 F.3d 1003, 1012 (6th Cir. 1999).

### 1.        Whether evidence was suppressed

As noted in the R&R, it is not disputed that two pieces of evidence, the "other man" evidence and the ".357" statement were not disclosed and were "suppressed" within the meaning of *Brady.*  (Docket No. 189 at 44-45.)  The R&R concluded that Young, in response to the

22

Government's motion, had not challenged the Government's claim that it disclosed the "sideburns statements" and "media exposure" issue, and, therefore, the R&R concluded that those statements had not been suppressed within the meaning of *Brady* and it was thus impossible for Young to make out a *Brady* claim based on those issues. (*Id.*)

In his objections to the R&R, Young reiterated the position he stated in his response to the Government's motion, which is that the Government never turned over at least three specific statements from various witnesses that indicated that the Regions Bank robber had pronounced, gray sideburns, a physical feature which, Young contends, he never had. (Docket No. 180 at 46-47; Docket No. 196 at 22.) These statements were made by tellers Ms. Emerton, Ms. Carr, and by Ms. Emerton's young son. (*Id.*) In its motion and in its response to Young's R&R objections, the Government contends that counsel's affidavits establish that these statements were turned over to counsel at the appropriate time. (Docket No 172 at 68; No. 199 at 18-19.) The citation to the record provided in conjunction with this argument cites to an affidavit from trial counsel for the Government, Byron Jones, who stated that "I provided to Mr. Young's trial counsel at the beginning of trial *Jencks* material for all the witnesses that the United States intended to call during its case-in-chief." (Docket No. 42.) The Government also cites to statements in Edwards's and Knowlton's affidavits, in which they state that they were aware "that the victim tellers from the Regions Bank robbery described the robber as having sideburns." (See *e.g.* Docket No. 168 at 25.)

The Magistrate Judge also concluded that the "media exposure" materials were not suppressed because "the government avers that it provided defense counsel with the reports

prepared by Special Agent Whitten pertaining to the two tellers from the Regions Bank robbery having been exposed to media reports."  (Docket No. 189 at 44.)  In his motion response and in his R&R objection, Young contends that there were two Agent Whitten reports (one from January 1999 and one from August 1999), both of which discussed interviews with one of the Regions Bank tellers (Ms. Emerton) who identified Young by voice in the August 11, 1999 lineup.  (Docket No. 180 at 47-48; Docket No. 196 at 23-24.)  In these reports, Ms. Emerton describes seeing a picture of the alleged bank robber in the media well prior to her participation in the lineup.  (*Id.*)  Young contends that the January 1999 report was never turned over, because there is no record of the report in Edwards's or Knowlton's files and there is no evidence that they relied on the report in cross-examining Ms. Emerton.  (*Id.*)  Young argues that the January 1999 report is important because, in it, Emerton claims that she looked closely enough at the picture to know that she could not make a positive identification of the robber from it and, in the August 1999 report, she states that she did not look carefully at the picture.  (*Id.*)  In its response to Young's objections on this point, the Government simply states that Young has presented no evidence to support his claim of suppression.  (Docket No. 199 at 19.)

Clearly, a dispute remains about which materials were turned over.  It is not necessary to resolve this dispute, because, as discussed below, even assuming that all of this material was not turned over, there was simply no prejudice to Young.[7]

### 2.    Prejudice

---

[7] As the court will consider prejudice as to all of the *Brady* evidence, there is no reason to consider Young's alternative argument that, if the evidence was not suppressed, it would have been ineffective assistance of counsel to not raise the evidence at trial.  (Docket No. 196 at 25.)

24

As noted above, examining whether suppressed evidence is prejudicial for *Brady* purposes requires the court to consider the suppressed evidence collectively, not item-by-item. *Schledwitz*, 169 F.3d at 1012. Therefore, the question here is whether the combined effect of the .357 statement, the "sideburns" statements, the media reports issue, and the "suspicious man" report are such that, if this evidence had been turned over, there is a "reasonable probability" that the result would have been different. While the court considers the collective impact of the evidence, some discussion of the importance of the individual pieces of evidence is necessary.

By way of review, the "suspicious man" issue concerns a witness report that, on the date of the Regions Bank robbery, there was a "suspicious man," not Young, who fit a general description of the Regions Bank robber, who sought to change a large denomination bill at a bank near the Regions Bank, shortly before the robbery. (Docket No. 196 at 16-17.) In short, Young can only contend that, on the morning of the robbery, there was another man who generally looked like the Regions Bank robber (white male, 40-50 years old, medium height and weight), and who had an arguably mildly abnormal interaction with a teller at another bank. As Magistrate Brown pointed out, this evidence would not have undermined the voice identification testimony or the "bleach stain" evidence, and it would have done little to show that Young was not the robber, particularly as there is no allegation that this suspicious man attempted to rob the bank near the Regions Bank; again, the only allegation is that the man was viewed as "suspicious" by people who saw him and that he attempted to change a large bill prior to the Regions Bank robbery. (Docket No. 189 at 45.) Therefore, this is not particularly compelling evidence for Young.

The case for prejudice is not supported by the other pieces of evidence at issue either. Again, by way of review, the ".357 statement" relates to Jeffrey Emerton's statement to the FBI shortly after the robbery that the robber carried a .357 caliber revolver with a red dot on the front sight. (Docket No. 189 at 45.) Mr. Emerton is the husband of Ms. Emerton, the Regions bank teller who made the voice identification discussed above, and he was at the bank on the day of the robbery with his wife and son. (Docket No. 170.) He was apparently familiar with firearms and had previously owned a .357 caliber revolver. (*Id.*) This statement is arguably helpful to Young because such a weapon was never recovered from Young. (Docket No. 189 at 46.)

As discussed above, with so many witnesses reacting to a fast-moving situation, it is inevitable that there is not going to be complete agreement amongst all of the witnesses as to what they saw, and, as noted above, the jury was exposed to similar inconsistencies at trial. In light of this, as Magistrate Judge Brown aptly concluded in the R&R, "it is [] unlikely that the jury would have given much credence to testimony that the revolver carried by the robber was a .357 magnum with a red dot on the front sight, and not a .38 caliber Colt, from a man who was being held at gunpoint by an armed robber, all while his wife and son cowered under a desk nearby." (Docket No. 189 at 46.)

Furthermore, the testimony at trial supported the notion that Mr. Emerton was likely mistaken about the type of gun used. For instance, Agent Whitten analyzed the gun depicted in a surveillance photograph from the Regions Bank robbery, and he testified, in considerable detail, that the gun depicted in the photograph was consistent with the Colt .38 revolver recovered from Young, including pointing out the "horse" insignia on the gun depicted in the photo. (Crim

26

Docket No. 53 at 319-320.)  Agent Frensley also offered similar testimony, concluding that the gun depicted in the photo "had similar characteristics to a .38 Colt revolver."  (Crim Docket No. 54 at 424-25.)  Furthermore, on the chance that the gun used in the Regions Bank robbery was not a .38 Colt revolver, it is worth noting that none of the affidavits submitted by Young and his close relations indicate that Young did not own a .357 revolver.

Also, there is little reason to believe that the additional statements about the robber of the Regions Bank having gray sideburns would have made any difference.  As discussed above, the relevance of visual identification was minuscule at trial, and evidence was offered at trial that the robber of the Regions Bank had gray hair and pronounced sideburns.  (Docket No. 53 at 172.) For instance, on cross examination, Ms. Carr (who was a teller at the Regions Bank) testified that she could see the robber as he approached the bank and "you could see like the side.  I could tell he had gray hair and like gray sideburn type things ..." and she stated that she could not identify the robber as Young based on that visual.  (*Id.* at 184.)  Therefore, the jury heard that the robber of the Regions Bank had pronounced gray sideburns, noticeable from a distance and not identifiable with Young, and, therefore, other witness statements to the same effect would likely have made little difference at trial, given the limited relevance of visual identification evidence in this case.

Finally, as to Ms. Emerton's seemingly inconsistent statement to Agent Whitten about how closely she examined the media report, this statement is of little importance, given that Ms. Emerton made it abundantly clear at trial that she primarily identified the Regions Bank robber by voice; in fact the jury heard testimony that, in a photo lineup conducted long prior to the

27

voice identification line up, Emerton identified another individual (Mr. Burgin) as the robber, although she said she could not be sure without the opportunity to see a profile view of the individual.  (Crim. Docket No. 53 at 202-203.)  In short, the jury was well aware that Ms. Emerton's primary basis for identification was the robber's voice, and the jury, in all likelihood, would not have been swayed by learning that she had told Agent Whitten different things about how closely she had inspected a photo of the alleged robber in a media report.

Therefore, viewing these pieces of evidence collectively, it is clear that Young was not prejudiced by the fact that this evidence was not presented.  Individually none of the evidence is particularly helpful to Young, and, also, collectively the evidence is not such that the jury would have been swayed to reach a different result had all of the evidence been presented.[8],[9]

---

[8] With regard to his *Brady* claims, Young sought discovery, among other things, concerning (1) John Wayne Breeding, an individual who apparently failed a polygraph test that sought to explore his level of involvement in the Union Planters robbery and (2) about "certain automobile makes and models noted during the investigation of several robberies."  (Docket No. 172 at 77-79.)  Even though Young never asserted these issues in his Amended Petition, the Government discussed them in briefing, arguing that it had turned over the pertinent information about Breeding (that he failed the polygraph test) to Edwards and Knowlton and that none of the automobile information could exculpate Young because the information produced fruitless leads. (*Id.*)

In his motion to dismiss response, at considerable length, Young objected to these arguments, claiming that *habeas* discovery revealed that there was a "mountain" of evidence about Breeding that had not been turned over and claiming that discovery had revealed that an S-10 Blazer (a type of car owned by a member of Mr. Burgin's family) had been spotted near the scene of the Putham County Bank robbery and at a Citizen's Bank robbery (a robbery for which Young was not charged), and that the investigators knew about these sightings but had not turned over this favorable evidence to Young.  (Docket No. 180 at 41-46.)  Young argues that, to the extent Edwards and Knowlton knew about these matters, it was ineffective assistance of counsel that they did not more thoroughly pursue the leads.  (*Id.*)

In the R&R, Judge Brown wrote, "the movant does not raise a claim under Brady pertaining to [Breeding], nor has he sought to amend his pleadings to add one ... .  From this, the undersigned concludes that the movant did not intend to amend his Brady claim to include a

28

## C. Government's Objection

The Government's main objection to the R&R comes from a single statement made by

---

claim pertaining to [Breeding.]" (Docket No. 189 at 43.)  The R&R does not address the S-10 Blazer issue.  Obviously, Young wants the court to consider his arguments relating to Breeding and the S-10 Blazer, and he contends that he should be allowed to argue these issues because the Government raised them in its Motion to Dismiss.  (Docket No. 196 at 25.)  The parties did not brief this issue of whether Young is precluded from arguing based on an issue raised by the Government.

That said, the court, after reviewing the Breeding issue, does not believe that there was any prejudice to Young from any failure of the Government to turn over more materials related to Breeding or from any failure of Young's counsel to more thoroughly investigate the Breeding lead.  First of all, this "mountain" of evidence is not compelling.  The evidence is essentially that (1) Breeding had a history of being investigated for bank robberies; (2) that he (or his associates) may have cased some banks and stores near the time of the Union Planters robbery; (3) that he had been seen around the Union Planters Bank five days before the robbery; and (4) that he had roughly the same height and weight as the robber.  (Docket No. 196 at 16-21.)  There is simply no evidence that directly ties Breeding to any of the robberies, and, moreover, it is undisputed that Breeding was in police custody at the time of four of the five robberies.  As the jury obviously concluded that all of the robberies were related, it is not plausible that this underwhelming evidence that attempts to tie Breeding to one of the robberies would have swayed the jury.

The "S-10 Blazer" evidence is similarly unavailing.  Ultimately, the evidence is that one witness spotted an S-10 Blazer leaving a dental office parking lot very soon after the robbery of Bank of Putham County, perhaps operating as a "get away car," but perhaps simply leaving the dentist's office.  (Docket No. 199 at 16-17.)  Further investigation also revealed that an S-10 was not spotted near the scene of the other robbery, but rather it was an S-14 Blazer, apparently unconnected to any of the principals in this case.  (*Id.*)  Simply put, the "S-10 Blazer" evidence is not compelling and would not have swayed the jury in this case.  Therefore, the Breeding and S-10 arguments are not convincing, and, as indicated above, Young's *Brady* claims will be dismissed.

---

[9] In its R&R objection, the Government, without providing any legal standard, contends, through a series of purely conclusory statements, that these pieces of evidence are not "exculpatory" or "impeaching" and implies that Judge Brown should not have assumed that they were before considering suppression and prejudice.  (Docket No. 191 at 8.)  Again, the court finds that there was no prejudice and, therefore, there is no *Brady* violation here as a matter of law.  Further, the Government points the court to no authority dictating that it must consider every element of the *Brady* claim before deciding that the claim is without merit.

29

Judge Brown. That is, on page 46 of the R&R, Judge Brown wrote, regarding the .357 statement and the "suspicious man" materials, "although there is no question that the prosecution was remiss in not disclosing this evidence to the defense, there also is no question that, had this evidence been disclosed, the result of the proceeding would <u>not</u> have been different. In other words, given the strength of the case against the movant, the suppressed evidence – viewed collectively – was not material." (Docket No. 189 at 46.) (emphasis in original). The Government argues that this paragraph implies (incorrectly) that the Government would have a duty to disclose non-material evidence to the defense, something, which, it contains, is outside of the duties established by *Brady* and similar case law. (Docket No. 191 at 1-7.)

Indeed, the Government contends that "the *Brady* rule leaves with prosecutors discretion to disclose non-material information," and, unless Judge Brown's discussion is "clarified," "prosecutors, defense lawyers, defendants, and the public" could be led "astray" as to the Government's burden under *Brady.* (*Id.* at 2.) The Government goes on to cite a series of Supreme Court cases that clearly indicate that it is not the Government's burden to turn over its "entire file," but only that evidence, the suppression of which would deny the defendant due process and a "fair trial" because, with this evidence available to the defendant, there is a "reasonable probability" that the result of the case would have been different. (*Id.* citing *U.S. v. Bagley*, 473 U.S. 667, 675 (1985); *U.S. v. Agurs*, 427 U.S. 97, 107-09 (1976); *Kyles v. Whitley*, 514 U.S. 419, 437 (1995)). The Government also cites several circuit and district court cases for this proposition that *Brady* does not compel "broad [or unlimited] discovery." (*Id.* at 5.) The Government also notes that there are a few district courts that have imposed the more stringent

30

discovery requirement that the Government "disclose all favorable evidence before trial." (*Id.* at 6.) The Government concludes that "this view that *Brady* requires prosecutors to disclose all favorable information without regard to its materiality is not beyond question. Rather, it has yet to gain substantial acceptance among the courts." (*Id.*)

Here, there is no reason for the court to step into this thicket. It is clear from this court's ruling that the court does not follow the R&R in all respects, and also, that there is no question as to prejudice on the *Brady* claims. The court concludes, consistent with settled case law, that, if there is no question that the failure to disclose the material was not prejudicial, there can be no viable *Brady* objection. *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). It is, therefore, not necessary for this court to weigh in on where precisely the "disclosure line" is for the prosecutor.

## **CONCLUSION**

For the reasons discussed herein, the court will schedule an evidentiary hearing on two issues. That is, whether Young has a viable ineffective assistance of counsel claim as to the alibi

witness and lay witness issues discussed herein.[10],[11]

An appropriate order will enter.

_____

ALETA A. TRAUGER
United States District Judge

---

[10] The court is in receipt of a letter from Young complaining that Young's current counsel does not communicate with him about this case and does not send him pertinent materials. (Docket No. 200 Ex. 2.) This is not the first such complaint that Young has filed with the court since his present counsel took over his representation after a conflict forced Young's previous *habeas* counsel to withdraw. On the one hand, the court is troubled by the allegations in Young's letter, but, on the other hand, the briefing of Young's counsel (while somewhat delayed) demonstrated a thorough understanding of the case along with zealous advocacy. While there is perhaps a communication problem here between attorney and client, the court declines to order a communication "schedule," as Young requests, but, rather, hopes that the two can work productively together in preparation for the evidentiary hearing.

[11] Judge Brown concluded that a Certificate of Appealability (COA) should not issue as to any of the claims brought by Young. (Docket No. 189 at 47.) When the district court denies a ground for relief on the merits in a *habeas corpus* action, a COA "may issue ... only if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), **the standard being whether "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."** *Slack v. McDaniel,* **529 U.S. 473, 484 (2000). In objecting to the R&R, Young only challenged Judge Brown's findings as to the ineffective assistance of counsel claim and the** *Brady* **claim. The court will conduct a further hearing on the ineffective assistance of counsel claim, and, as to the** *Brady* **claim, the court concludes that no COA should issue because Young has not made a "substantial showing of the denial of a constitutional right." Denial of a COA from this court, of course, does not preclude the petitioner from seeking a COA from the Sixth Circuit Court of Appeals.** *See Wilson v. U.S.*, **287 Fed. Appx. 490, 494 (6th Cir. 2008).**

Case 2:03-cv-00040   Document 203   Filed 07/02/09   Page 32 of 32 PageID #: 1206