IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

| | | |
|---|---|---|
| R.V. YOUNG, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. 2:03-0040 |
| | ) | Judge Trauger |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

## MEMORANDUM

A two-day evidentiary hearing was held in this matter on October 27 and 28, 2009. The purpose of the hearing was to consider whether the petitioner, R.V. Young, received ineffective assistance of counsel prior to and during his July 2000 trial for five armed bank robberies that occurred in this district in late 1997 and early 1998. For the reasons discussed herein, the petitioner's ineffective assistance of counsel claim is ultimately unavailing and, therefore, his Section 2255 *habeas* Petition will be denied.

## RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

The protracted procedural and factual history of this case leading up to the evidentiary hearing has been thoroughly addressed in prior Memoranda, specifically Judge Brown's March 13, 2009 Report and Recommendation ("R&R") and this court's July 2, 2009 opinion that ruled on the objections to the R&R. (*See generally* Docket Nos. 189 and 203.) By way of a brief review, in February 2000, Young was indicted for the five robberies, and, after a three-day jury trial in this court in July 2000, Young was convicted on all counts and subsequently sentenced to

1

ninety-two years in prison. After his direct appeal to the Sixth Circuit was denied (and the deadline to seek a writ of certiorari from the Supreme Court passed), Young filed this 28 U.S.C. § 2255 (*habeas corpus*) action *pro se* on April 23, 2003. (Docket No. 1.) Thereafter, Young was appointed counsel, and, on October 4, 2004, he filed an Amended and Supplemental Petition, which alleged several claims. (Docket No. 34.) After lengthy delays involving issues that are not directly germane to the present proceedings, on July 31, 2008, the Government filed a dispositive motion (construed by the court as a Motion for Summary Judgment), seeking to dismiss Young's *habeas* Petition. After Young filed his response on December 5, 2008, the matter was referred to Magistrate Judge Brown.

In the R&R, Judge Brown analyzed each of Young's arguments and recommended that Young's Petition should be dismissed with prejudice. (Docket No. 189 at 47-48.) After both sides filed timely objections to the R&R, the court concluded that, while it agreed with Judge Brown's recommendations on most issues, the objections raised by Young to Judge Brown's findings on certain aspects of Young's ineffective assistance of counsel claim were significantly compelling to warrant an evidentiary hearing on that claim. (Docket No. 204.) Specifically, the court concluded that an evidentiary hearing should be held as to whether Young's trial counsel, Joe Edwards and Michael Knowlton, acted reasonably in regards to proposed alibi witness Donnie Richards and whether counsel acted reasonably in regards to other lay witnesses, that is, specific members of Young's family.[1] (*See* Docket No. 203 at 15, 21.) Consistent with the

_____

[1] While Young was represented by both Edwards and Knowlton during the criminal trial, it is clear from the testimony during the evidentiary hearing that Edwards was the lead counsel, made the key decisions, and was involved in the key events to a significantly greater degree than

relevant precedent, whether Young was prejudiced by any unreasonable attorney conduct would also be a key issue in the evidentiary hearing.

Interwoven with the alibi and lay witness issues is the factual dispute as to whether Young confessed to Edwards before the trial that he had committed three of the charged robberies, that is, the December 19, 1997 Union Planters Bank robbery, the March 11, 1998 Regions Bank robbery, and the January 16, 1998 Bank of Putnam County robbery. According to Edwards, Young confessed to these robberies, but Young did not confess to the other two robberies with which he was charged, that is, the White County Bank robbery on March 26, 1998 and the First Tennessee Bank robbery on February 17, 1998. Edwards contends that he told Knowlton of the confession and the two, consistent with professional ethics rules, substantially altered their trial strategy in light of the confession. According to Young, no such confession was ever made. Some factual background on each of these issues (alibi, family lay witnesses, and confession) is appropriate.

### A.    Alibi

As discussed in the court's earlier Memorandum, in response to the Government's Motion for Summary Judgment, Young submitted an affidavit from Donald ("Donnie") Richards, who stated that he has known Young in a "business context" for about twenty-five years, that is, he used Young (who was a horse trainer) to train horses and, from time to time, to drive goats to other states for him. (Docket No. 180 Ex. B.) In his affidavit, Richards stated

---

Knowlton was. Therefore, most of the discussion of counsel's performance inevitably discusses Edwards, not Knowlton.

3

that, prior to Young's trial, he had given Edwards "a trip sheet and a set of receipts that placed Mr. Young in another state at the time of one of the robberies [the March 11, 1998 Regions Bank robbery] that Mr. Young was charged [with]." (*Id.*) That is, Richards, with certainty, claimed that he "could have placed Mr. Young in another State on a [goat] delivery run during one of the bank robberies," and, therefore, he was subpoenaed to testify at trial and came to trial each day, but, inexplicably, was never called to testify. (*Id.*)

In affidavits submitted in support of the Government's motion, Edwards and Knowlton recognized that, during pre-trial discussions with counsel, Young had claimed that he had an alibi witness (Richards) for one of the robberies, but, upon investigation, this path turned out to be unavailing. (*See* Docket No. 168 at 5.) Specifically, counsel noted that, when they talked to Richards pre-trial, he was unable to positively identify Young as the individual who made the March 11, 1998 goat delivery and, while there were receipts collected by Richards' company in conjunction with such a trip, none of the trip receipts identified the driver. (*See id.*) In their affidavits, counsel also stated that, at some point during pre-trial preparations, Young had confessed to the Regions Bank robbery (and two others), and, therefore, they did not feel that they could ethically put Richards on the stand to testify to something that they knew could not have happened. (*See id.* at 13.)

While recognizing that Young's denial that he ever confessed to his counsel and the various affidavits raised fact issues that could, under other circumstances, warrant an evidentiary hearing on this aspect of Young's claim, Judge Brown recommended that the Government prevail on this aspect of Young's claim because Young could not, as required, establish that he

4

was prejudiced by Richards' failure to testify. (Docket No. 189 at 13-14.) The court disagreed with this conclusion, stating that "[the court] does not view the evidence against the defendant in this case as so overwhelming that the firm, convinced testimony of an alibi witness with little apparent bias could not have legitimately raised a reasonable doubt in the jury's mind as to whether Young had robbed the Regions Bank." (Docket No. 203 at 12-13.) Also, the court found that, based upon the Government's argument that all of the robberies were committed by the same person, "this potential prejudice extends not just to the Regions Bank robbery conviction, but to Young's convictions for the other four bank robberies." (*Id.* at 15.)

The testimony at the evidentiary hearing established that, at Young's urging, Edwards visited Richards and collected the trip tickets and receipts related to the March 11, 1998 goat delivery trip. (Docket No. 217 at 321-22, 354-55; Docket No. 216 at 20, 33.) While, during Edwards' visit, Richards suggested to Edwards that Young may very well have made the goat delivery run, he was not sure of that, and nothing on the trip tickets or receipts certified that Young made the trip at issue. (Docket No. 217 at 323-24, 391-92; Docket No. 216 at 34.) That is, while the trip receipts indicate that, from March 11 through March 13, 1998, someone from Richards' company was on a delivery run to Pennsylvania, nothing on the trip receipts indicates who that employee was. (See Evidentiary Hearing Ex. 1.) Also, Edwards recalled a discussion with Richards regarding the size of the truck that would have made this type of run, that is, Richards informed him that a relatively small truck would have made this particular run, not a large semi-truck. While Richards confirmed that only a small truck would make this type of run, he does not recall discussing this with Edwards. (Docket No. 217 at 396-97; Docket No. 216 at

5

33-34, 73-74.)

Additionally, Richards expanded on his affidavit, stating that there was only one relatively small truck and that either he or Young would have driven it to Pennsylvania on March 11, 1998, because his regular drivers did not like driving smaller trucks. (Docket No. 216 at 18, 30-32. 61, 74.) However, Richards also testified that, while he now believes that Young was the driver, he (Richards) also could have been the driver. (*Id.* at 31.) That said, Richards believes it is unlikely that he (Richards) was the driver because he was the boss, was very busy, and would not have filled out a trip report or collected receipts for his own trip. (*Id.* at 74.) While Richards was somewhat unclear and confused in his testimony as to what precisely he told Edwards about all of this, it is clear from the testimony that Richards has never held or communicated a certain belief that Young definitely took the trip at issue and there is nothing in the trip receipts that, with any certainty, places Young outside of the state on the day of the Regions Bank robbery. (See *id.* at 34, 42-43, 68.) Indeed, Richards testified that it was only in preparing for the evidentiary hearing that he realized the strength of the connection between Young and the small truck that would have been used for this type of delivery run. (*Id.* at 76-78.)

Edwards testified that, for two main reasons, it would have been "folly" to call Richards during the trial. (Docket No. 217 at 336-37.) First, as summarized by the Government, it was Edwards' opinion that "this was not good alibi evidence because there was nothing on the ticket or in the statement of Mr. Richards that would establish that Mr. Young made the trip evidenced by" the trip tickets and receipts. (Docket No. 221 at 5.) Second, as noted above, Edwards claims that, at some point, Young had confessed to him that Young had committed the Regions Bank

6

robbery, and, therefore, Edwards could not offer testimony that indicated that Young was not the robber when, in fact, he was. (Docket No. 217 at 336-37.)

However, Edwards testified that he reached the conclusion that Richards' testimony would not have been good alibi evidence prior to Young's confession, which, as discussed below, Edwards claims occurred sometime "toward the end of trial preparation." (*Id.* at 330, 362-63.) Edwards testified that he subpoenaed Richards for trial only on Young's insistence, but, at the time of trial, it was clear to Edwards that he would not call Richards. (*Id.* at 384-85.)

### B.    Family Lay Witnesses

As discussed in the court's earlier Memorandum, in response to the Government's Motion for Summary Judgment, Young submitted affidavits from his fiancee (Judy Radford), his stepmother (Willa Mae Young), and his son (Randy Young), all of whom stated that Edwards and Knowlton were non-communicative and dismissive with them before and during the trial and that they could have offered testimony to "rebut[] the damaging testimony of Donna Goss." (Docket No. 180 Exs. C-E; Docket No. 196 at 11.) Goss was Young's former girlfriend who, at trial, testified that she could tell that the masked robber in the surveillance photos from a couple of the robberies (including Regions Bank) was likely Mr. Young. (Crim. Docket No. 53 at 256-65.) She based that testimony on her familiarity with Young's face, his hands, his (bowlegged) stance, his clothes, and his hat. (*Id.*) Also, she testified that she recognized the stained coveralls worn by the robber in the Regions Bank surveillance video as similar to the ones that Young wore. (*Id.* at 260.)

In their affidavits, Young's family members claimed that they would have rebutted this

7

testimony by, drawing on their personal experience, describing Young as a well-kempt person who would never have worn stained clothes and did not own certain articles of clothing that appeared in the Regions Bank surveillance video, such as stained coveralls and an orange Tennessee Volunteers baseball cap. (Docket No. 180 Exs. C-E.) It was also clear that their descriptions of Young as clean-shaven and well-kempt could have raised questions about the identifications made by at least two bank tellers at trial, who stated that, from their fleeting glimpses of the robber before he put on his mask, the robber appeared to have pronounced sideburns and was not clean shaven. (Crim. Docket No. 53 at 172, 184)(testimony of Beth Carr, teller at the Regions Bank stating that the robber had "sideburns and stuff" and "gray sideburn type things"on his face); (Crim Docket No. 52 at 51)(testimony of Jennifer Garnett, teller at the Union Planters Bank stating that the robber "wasn't clean shaven"). But, these family members claim, the failure of Young's counsel to engage them or respond to their offers of assistance prevented this testimony from being offered at trial.

In their affidavits, Edwards and Knowlton claimed that it was not unreasonable for them to not engage these witnesses because: (1) it would have been unethical to challenge Goss's identification based on the Regions Bank surveillance tape because Young had confessed to the Regions Bank robbery; (2) as to the non-confessed robberies, the testimony would have been unhelpful because these witnesses had an "obvious bias in [Young's] favor;" and (3) Goss was not a particularly compelling witness so there was little need to call further witnesses to rebut her testimony. (*See* Docket No. 168 at 14.) While Judge Brown recommended granting summary judgment for the Government on this issue, the court concluded that there was a fact issue as to

both the reasonableness of counsel's conduct as to these witnesses and the potential prejudice from failing to call them at trial.  (Docket No. 203 at 19-21.)

At the evidentiary hearing, Edwards testified that, prior to trial, he met with Randy Young at his father's horse barn and became convinced, based upon Randy's non-communicative, evasive, and shy nature, that he would not make a good witness at trial.  (Docket No. 217 at 327-329.)  Edwards also testified that he spoke by telephone with Judy Radford on several occasions, and Radford indicated that her opinion that Young was innocent was based upon her impression of him as a "nice man."  (*Id.* at 329-330, 388-89.)  Edwards testified that she was obviously blinded by her affection for Young and would not have made a good witness due to her clear biases.  (*Id.* at 331.)  Edwards testified that he had similar concerns about calling Young's step-mother, Willa Mae Young.  (*Id.* at 343.)

Edwards also testified that calling these witnesses would have opened the door to unfavorable testimony.  (*Id.* at 331, 392-93.)  Specifically, in the time leading up to his arrest, Young had been involved in at least three unfavorable incidents/activities: (1) in April 1998, he disappeared for five days and was reported kidnapped, although he emerged unharmed (dirty and unshaven) and shortly thereafter signed a statement confessing to the police that the incident was a drug-fueled hoax to obtain ransom money; (2) daily or semi-daily use of crack cocaine; and (3) in August 1998, he was arrested for robbing a Cash Express store and later pled guilty to that crime in Tennessee state court.  The testimony at the trial did not reveal the first two of these.

Edwards also now claims that the family members' proposed testimony about Young's grooming habits and clothes would not have been helpful, because, as the Government puts it,

9

"most bank robbers do not wear their normal attire during bank robberies, but rather try to disguise themselves."  (Docket No. 221 at 9.)  Additionally, as indicated above, it is Edwards' position that Young confessed to three of the robberies, and, therefore, Edwards felt that he could not ethically offer testimony that would have challenged Young's involvement in those bank robberies.  (Docket No. 217 at 379-85.)

Radford testified that she began dating Young in early 1994, they had moved in together shortly after that, and, after that, they had become engaged.  (Docket No. 216 at 81-83.)  Radford testified that Young always kept a neat and clean appearance, and she supported this claim with 15 photographs taken from August 1994 to June 1998, all of which showed Young happily enjoying various events with friends and family and always dressed and groomed in a consistent and neat way, that is, clean-shaven with clothes neatly tucked in and so forth.  (Evidentiary Hearing Ex. 4.)  Radford testified that she never observed Young wearing any hats that did not have horse emblems on them, that Young shaved every day and did not have sideburns, and that Young did not wear stained coveralls like those observed by Goss in the Regions Bank surveillance photo.  (Docket No. 216 at 95-106.)  Radford also testified that, unlike Goss, she did not consider Young to be "bowlegged."  (*Id.* at 106.)

On cross examination at the evidentiary hearing, Radford acknowledged that she did not know all of the alleged details of Young's life leading up to the time of his arrest.  Indeed, she testified that she did not see Young during his alleged kidnapping in April 1998, and she did not know Young was using crack cocaine or having other relationships.  (*Id.* at 113-116.)   She also acknowledged that Young did use bleach around the horse barn, and his coveralls could have

10

gotten stained through a bleach spill. (*Id.* at 126-127.) Finally, she testified that she did not know of various personal items located by police following the Cash Express robbery (and subsequently connected to Young), including a (non-horse themed) black baseball hat and a gun. (*Id.* at 120-121, 128-30.)

Willa Mae Young also testified that, since childhood, Young had been very clean, with short hair, and that he did not wear dirty or ragged clothes. (*Id.* at 148.) On cross, Ms. Young did concede that Young looked disheveled when he returned from his five-day alleged kidnapping, and that she also had not seen the black baseball cap, tied to Young through his admitted robbery of the Cash Express store. (*Id.* at 156-158.)

Finally, entirely contrary to Edwards' testimony, Randy Young testified that he never spoke to Edwards prior to the trial. (*Id.* at 163.) He also testified that Young always wore his hair short and neat, always presented a trim, well-dressed and clean appearance, and only wore hats with horse emblems on them and non-stained coveralls. (*Id.* at 164-70.) On cross examination, Randy Young admitted that he had not seen the black baseball hat connected to Young following the Cash Express robbery, that he was unaware of his father's drug problem and that his father was not clean-shaven or neat when he returned from the alleged kidnapping in April 1998. (*Id.* at 180-87.)

### C. Confession

As discussed in the Memorandum, Judge Brown recognized that there was a clear factual dispute between Young and his counsel as to whether Young had confessed to Edwards, but Judge Brown also concluded that a resolution of this issue was not necessary to resolving the

11

Government's motion. (Docket No. 189 at 4.) For various reasons discussed in more detail in the Memorandum, the court concluded that the issue of whether Young had confessed was relevant, and, therefore, the confession was the subject of significant testimony at the evidentiary hearing.

Edwards testified that his representation of Young began in March 2000, with Mr. Knowlton assisting him in his representation. (Docket No. 217 at 351.) Edwards further testified that, at some point near the end of trial preparation, Young had confessed to the three robberies. (*See id.* at 330.) While Edwards provided little further detail in terms of the exact timing and nature of the confession, it was clear from his testimony that the confession only came after a series of denials from Young and significant pressure and probing from Edwards. (*See id.* at 358)

The only significant detail, other than the banks involved, that Edwards recalled during his testimony was that the confession occurred at the Putnam County Jail, which was one of the several locations in which Young was housed from the time of his arrest for the Cash Express robbery until his trial for the five bank robberies. (*Id.* at 319, 332.) While Edwards testified that he could not remember other details of the confession, he provided detailed testimony regarding his specific visual recollection of himself walking into the Putnam County Jail, meeting with Young at that jail and Young's confessing. (*Id.* at 331-32, 361, 393.) Edwards rejected the Government's suggestion on re-direct that the confession could have occurred in another facility and, while recognizing that memories fade with time, he testified that, "I can tell you if I have not lost my mind, [the confession was] in the Putnam County Jail in a little consultation room to the

12

right as you walk down the hall when you are first admitted." (*Id.* at 393-94.)

Edwards testified that the confession forced a change in trial strategy, whereby he apprised Young of his duty to only present truthful testimony and he, therefore, repeatedly encouraged Young to consider pleading guilty in exchange for a reduced sentence. (*Id.* at 335-36.) Edwards testified that Young was unwilling to consider any option other than pushing forward with trial, even though, following the confession, Young essentially "didn't talk about it [any of the robberies] anymore." (*Id.*)

In light of Young's continued insistence on pushing forward and potentially testifying, Edwards testified that both he and Knowlton advised Young that, in light of his confession, if Young insisted on testifying, they would have to withdraw. (*Id.* at 340-42.) Both Edwards and Knowlton testified that Young's insistence on potentially presenting false testimony continued through the first couple of days of the trial, even after Knowlton reminded Young, without contradiction from Young, that Young had confessed to three of the robberies. (*Id.* at 340-41, 414-15.) On the final day of the trial, with Young still insisting on offering an unethical defense, Edwards and Knowlton testified that they engaged in an *ex parte* meeting with the court, in which, consistent with their ethical training, they informed the court that they would have to withdraw if Young insisted on taking the stand. (*Id.* at 341, 417) Edwards later informed Young of the meeting and explained Young's options, that is, Young could press on dishonestly without his counsel or the defense would not put on any proof and would argue, at closing, that the Government had not met its burden of proof. (*Id.* at 342.)

The record from the trial indicates that, after an extended lunch recess on the final day of

13

the trial, Edwards announced to the court that "Mr. Young just made a decision not to put a case on," and Edwards suggested that the court question Young to confirm that the decision not to put on a case was a knowing and voluntary one. (Crim. Docket No. 54 at 482-83.) The court conducted that questioning and Young confirmed that he was aware of his right to testify and to put on witnesses, but that it was his desire, after having had the opportunity to confer with family members and counsel, not to put any witnesses on and not to testify on his own behalf. (*Id.*)

Again, the contrast in testimony on this issue is stark. Young testified that he never confessed to any of the bank robberies, and that, on the last day of trial, Edwards simply advised him that they were not going to put on a case because Edwards did not feel that the Government had met its burden of proof and, therefore, the defense could win the case in closing argument. (Docket No. 216 at 210, 253-255.) Young also testified that Edwards instructed him that, if the court attempted to question Young about this decision, he should just "go along" with the plan not to testify. (*Id.*)

Additionally, in his rebuttal, Young offered the testimony of Tiffany Goolsby, an employee with the Putnam County Sheriff's Department. (Docket No. 217 at 420-23.) Ms. Goolsby testified that, at the request of Young's counsel, she had pulled Young's file from the Putnam County Jail, and that file indicated that Young had only been housed at the Putnam County Jail for five days, in August 1997. (*Id.*) The purpose of this testimony was to show that, because Young was not in the Putnam County Jail during the course of Edwards' representation of him, Edwards' vivid recollection that Young confessed to the robberies in the Putnam County Jail could not be correct.

14

## ANALYSIS

**I.     Ineffective Assistance of Counsel**

To prevail on a Sixth Amendment ineffective assistance of counsel claim, the plaintiff must show that his "counsel's deficient performance prejudiced him." *Porter v. McCollum*, 130 S.Ct. 447, 452 (Nov. 30, 2009). In order to "establish deficiency, [the plaintiff] must show his 'counsel's representation fell below an objective standard of reasonableness.'" *Id.* (quoting *Strickland v. Washington*, 466 U.S. 668, 688 (1984)). As the Court recently stated, the reasonableness "standard is necessarily a general one. 'No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant.'" *Bobby v. Van Hook*, 130 S.Ct. 13, 16 (Nov. 9, 2009)(quoting *Strickland*, 466 U.S. at 688-89). While the professional rules of conduct and restatements in place at the time can be a useful guide in assessing the reasonableness of conduct, they also cannot be viewed as definitive. *See id.* at 16-17. Therefore, "the proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Knowles v. Mirzayance*, 129 S.Ct. 1411, 1420 (Mar. 24, 2009)(quoting *Strickland*, 466 U.S. at 688).

That said, under *Strickland*, "[j]udicial scrutiny of counsel's performance must be highly deferential," and a court must resist the temptations of hindsight and "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." 466 U.S. at 689. Indeed, "strategic choices made after thorough investigation of law

15

and facts relevant to plausible options are virtually unchallengeable." *Id.* at 690.

Likewise, the prejudice standard is factually and contextually specific. To establish prejudice, the plaintiff "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Capturing the deferential nature of the test and the relative difficulty of establishing an ineffective assistance of counsel claim, the Sixth Circuit has stated that "the determinative issue is not whether petitioner's counsel was ineffective but whether he was so throughly ineffective that defeat was snatched from the jaws of victory." *West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996) (internal quotation omitted). With this standard in mind, the court turns to the alibi and family lay witness issues that were the basis for the evidentiary hearing.

### A. Alibi

It is important to recall why the court ruled that the alibi issue should be heard in an evidentiary hearing. That is, in his affidavit, Richards definitively stated that, at the time of the trial of this matter, he "could have placed Mr. Young in another State on a [goat] delivery run during one of the bank robberies." (Docket No. 180 Ex. B.) On this basis, the court concluded that there was a fact issue as to whether counsel had acted unreasonably. Moreover, the court concluded that it was unsettled whether "the firm, convinced testimony of an alibi witness with little apparent bias could []have legitimately raised a reasonable doubt in the jury's mind as to whether Young had robbed the Regions Bank," and, therefore, the other banks as well. (Docket No. 203 at 12-13, 15.)

However, as is made clear in the factual discussion, Richards, to a fairly significant

16

degree, overstated his ability in the affidavit. Both his testimony and Edwards' testimony (combined with the trip receipts) raised only the reasonable possibility that, based only on the recalled norms of Richards' company, Young took the trip at issue. Nothing in Richards' testimony or in the record established that Young took the trip. Additionally, as discussed above, both Edwards and Richards testified that, while Richards believed at the time that Young may very well have taken the trip, Richards could not be certain of that. (Docket No. 216 at 34; Docket No. 217 at 323.) Indeed, as discussed above, Richards testified that it was only in preparing for the evidentiary hearing that the connection between the use of the small truck and Young's previous driving of small trucks crystalized in his mind, enhancing his relative certitude that Young took the trip at issue. (Docket No. 216 at 76-78.)

It was also clear from the testimony that, consistent with reasonable attorney behavior, Edwards, prior to any alleged confession, took Young's suggestions and visited Richards, talked with him, and collected the receipts at issue. As Edwards testified, he reviewed the receipts and concluded that it would be "folly" to have Richards testify as an alibi witness because Richards could not establish that Young took the trip, and, therefore, a supposed alibi witness would be nothing more than an underwhelming and unsure witness. (Docket No. 217 at 336-37.)

The conduct of Young's counsel here falls "within the wide range of reasonable professional assistance." While reasonable minds could disagree with the approach taken by Edwards here, that is, they could conclude that a reasonably sure alibi witness is better than no witness at all, the fact remains that nothing on the trip tickets or in the record establishes that Young took the trip at issue on the day of the Regions Bank robbery. Additionally, by Richards'

17

own testimony, his current thought process, which concludes that Young was the driver by process of elimination, was not developed at the time that Edwards and Richards would have been meeting. Therefore, at the time of the meeting, Richards was only in the position to state that a small truck had been used to make the drive up to Pennsylvania and that Young may have been the driver. It was not unreasonable, in light of this, for Edwards to conclude that Richards' testimony would be sufficiently weak that it would not assist his client to offer it.

As the reasonableness prong of the ineffective assistance test is not satisfied in Young's favor, it is not necessary to reach the prejudice question.

### B. Family Lay Witnesses

Unlike the alibi issue, it is clear that Edwards' decision not to more thoroughly investigate and pursue the knowledge of witnesses with close ties to Young, such as Judy Radford, Randy Young and Willa Mae Young, was directly influenced by Young's confession. Indeed, Edwards testified that, at the time of the confession, he did not have a well-developed defense strategy. (Docket No. 217 at 333.) Additionally, Knowlton testified that, up until he learned from Edwards that Young had confessed, he understood that the defense strategy was to be what he referred to as the "SODDI" defense, that is, "some other dude did it." (*Id.* at 410.)

However, Edwards testified that Young's confession was a game changer, whereby he shifted away from attempting to gather information to trying to impress upon Young the importance of working out a plea agreement. (*Id.* at 333.) Additionally, Edwards, in essence, testified that Young's confession short-circuited any fruitful discussion with individuals such as Judy Radford. Edwards testified that, in light of Young's confession, he "really had to quit

18

talking to" Radford, because she was trying to impress upon Edwards that Young had to be innocent. (*Id.* at 330.)  Edwards also testified that the development of identity evidence to rebut Goss could have been helpful (and presumably therefore should have been developed) but for "the knowledge that I had at the time." (*Id.* at 384.)  Finally, Edwards stated that the confession ultimately convinced him that Young was guilty of all five robberies, and, therefore, his efforts were expended on trying to get Young to plead guilty, rather than attempting to develop evidence that Young did not commit the unconfessed robberies. (*Id.* at 386-87.)

In light of this testimony that the confession drove Edwards' decision-making process, it is necessary to explore the factual dispute as to whether the confession actually occurred.[2]  As indicated above, even accepting the obvious point that memories fade, there are considerable issues with Edwards' recollection of the confession, particularly in light of the importance that Edwards himself places on the confession.  That is, despite the confession's importance, Edwards (1) cannot say when in the trial preparation process it occurred (other than that it was "towards" the end), (2) has offered little substantive detail about the confession and, (3) during the evidentiary hearing, painted a vivid picture of the confession occurring at the Putnam County Jail,

---

[2] As discussed in the factual section, Edwards offered various other reasons for why he did not further engage witnesses such as Radford, Randy Young, and Willa Mae Young, that is, Edwards contends that they would not have made good witnesses and were biased.  In light of the entire record, the court views these explanations as part post-hoc rationalization and part secondary explanation.  *See Wiggins v. Smith*, 539 U.S. 510, 526-27 (2003) (post hoc rationalizations for attorney conduct should not be credited).  Particularly in light of Knowlton's testimony regarding the planned SODDI defense and Edwards' own testimony that the trial strategy was not well developed at the time of the confession, the court can only conclude that the primary reason why avenues that could have produced evidence (such as the photographs introduced at the evidentiary hearing) to challenge the testimony of Goss and other identification testimony were not explored was because of Young's alleged confession.

19

when later testimony conclusively demonstrated that Young was not housed at the Putnam County Jail during Edwards' representation of him on these charges.

On the other side, while Young testified that he never confessed to Edwards, Young is a thoroughly unreliable witness. (Docket No. 216 at 254-55.) Young's evidentiary hearing testimony was littered with contradictions and inconsistent statements. In one of the most notable examples, Young testified that he had indeed robbed the Cash Express store, as was consistent with his previous statements and his guilty plea in the Tennessee state court proceedings. (*Id.* at 235.) However, not five minutes later, Young recanted this testimony and stated that he had not actually robbed the store but was set up by individuals who threatened to harm his family if he told the truth. (*Id.* at 241-46.)

Also, Young, inconsistent with his previous admissions, testified at the evidentiary hearing that he had actually been kidnapped in April 1998 by drug dealers who threatened to harm his family. (*Id.* at 225-33.) Then, counsel for the Government, line by line, walked through Young's previous written statement, in which he admitted to police that the kidnapping was a hoax. (*Id.*) In the testimony that followed, Young claimed that parts of that statement were true, that is, while he had been kidnapped, two days into the kidnapping, he was released and, rather than going home, he went to a motel to smoke crack with a female acquaintance before spending the remainder of the night in his truck outside of the "Huddle House" restaurant. (*Id.*) Young's willingness to tell inconsistent and not credible stories on the witness stand obviously undercuts the court's ability to credit his testimony regarding the absence of a confession.

Additionally, while there are significant problems with Edwards' recollection of the

20

confession, logic dictates that a confession, in all likelihood, did occur. Most notably, there would be no reason for Edwards and Knowlton to have requested the *ex parte* meeting with the court unless Young had made some damaging admission. Additionally, the court can detect no reason why, at the time of the trial, Edwards and Knowlton would falsely operate under the premise that a confession had occurred. Therefore, despite the court's misgivings about Edwards' testimony regarding the confession, the court will credit Edwards' and Knowlton's testimony and operate on the assumption that Young, at some point relatively late in the trial preparation process, implicated himself in three of the five robberies.

The next issue, then, is whether Edwards acted reasonably in response to Young's confession. As discussed above, in light of the confession, Edwards' undeveloped trial strategy immediately shifted to a focus on a plea, thereby preempting further investigation and conversations with individuals such as Judy Radford, who had evidence along the lines of the photographs introduced at the evidentiary hearing. The evidence and the relevant case law establishes that Edwards' conduct in this regard was unreasonable.

It is well established that defense counsel has an independent duty to investigate the facts and circumstances of a crime, and this duty exists even if the client expresses a desire that the attorney not investigate or suggests that investigation may be futile. *See Strickland*, 466 U.S. at 680. That is, "[c]ounsel cannot responsibly advise a client about the merits of different courses of action, the client cannot make informed decisions, and counsel cannot be sure of the client's competency to make such decisions unless counsel has first conducted a thorough investigation with respect" to the allegations against the defendant. *Dickerson v. Bagley*, 453 F.3d 690, 693-94

(6th Cir. 2004).

The duty to investigate is not eviscerated when a client makes a damaging admission to his counsel. *See Rompilla v. Beard*, 545 U.S. 374, 387 (2005)(referring to the ABA Criminal Justice Section Standards as a "guide" to reasonable attorney conduct and quoting Standard 4-4.1 [in place at the time of Young's trial] that states: "[t]he duty to investigate exists regardless of the accused's admissions or statements to [defense counsel] of facts constituting guilt or the accused's stated desire to plead guilty.")

Indeed, a recent case from the Ninth Circuit explicitly states that "[a] defendant's admission of guilt to his lawyer does not absolve the lawyer of his duty to investigate the crime. . . . counsel must [still] explore all avenues leading to facts relevant to the merits of the case. The duty to investigate exists regardless of the accused's admissions or statements to the lawyer of facts constituting guilt." *Duncan v. Ornoski*, 528 F.3d 1222, 1238 (9th Cir. 2008)(internal quotations omitted)(finding counsel's failure to conduct further blood sample testing to be unreasonable to the extent that it was based on his client's private confession of guilt).

This long-standing rule of professional conduct exists so that counsel is required to "consider all of the defendant's statements [and the evidence in the case], not just those that make his job easier." *Id.* at 1239. Indeed, as here, a client's confession to his counsel often occurs only after numerous denials of responsibility and may be followed by subsequent denials of responsibility or amendments to the statement of guilt. It is therefore generally "unreasonable for [counsel] to rely on any one of [his client's] statements in isolation when making tactical decisions about investigating the crime." *Id; see also Lisker v. Knowles*, 651 F. Supp.2d 1097,

22

1122 (C.D. Cal 2009)("As Petitioner's defense attorney, Mulcahy had a duty to fully investigate and present a defense regardless of whether Petitioner failed to proclaim his innocence, or pleaded guilty, or admitted his guilt . . . ."); *Ramseyer v. Blodgett*, 853 F. Supp. 1239, 1256 (W.D. Wash 1994)("The duty to investigate is not eliminated by the client's own conclusions or admissions of guilt, because the client's beliefs may not coincide with the necessary elements of proof to establish guilt in law.").

The Government spends a considerable portion of its brief arguing that Edwards behaved reasonably and, indeed, ethically, because the relevant professional codes mandate that he not put on perjured testimony or evidence that counsel knows to be false. (Docket No. 221 at 30-45.) Also, citing Rule 3.3(d) of Tennessee Rules of Professional Conduct For Lawyers, the Government argues that Edwards had the discretion not to thoroughly probe witnesses such as Goss and the bank tellers who identified the robber as scruffy and not clean shaven because "a lawyer may refuse to offer or use evidence . . . that the lawyer reasonably believes is false, misleading, fraudulent or illegally obtained." (*Id*. at 43)(quoting the professional conduct rule).

While there is no dispute about the discretion afforded by Rule 3.3(d) or that it is not ethical to offer testimony that counsel knows to be false, the Government attempts to extend these points by arguing that, not only did Edwards and Knowlton exercise their discretion and properly dissuade Young from testifying falsely, but they "also did not endeavor to develop false or misleading testimony from other witnesses concerning the robberies that Mr. Young admitted." (*Id*. at 41.) Clearly, there is an important distinction between, on the one hand, during the trial, offering/developing evidence or testimony that counsel knows or believes to be false and, on the

23

other hand, refusing to conduct further investigation into matters relevant to the case because the client has made an admission of guilt to counsel. But that is the distinction that the Government attempts to blur here.

Under the ethical standards and the case law discussed above, it is unreasonable and inappropriate for counsel to abandon investigation because a client has admitted guilt to counsel. That is essentially what Edwards admitted to doing here. He admitted cutting off contact with Radford, abandoning efforts to locate additional identification evidence, and foregoing investigation into the two unconfessed robberies, all on the basis of Young's confession.[3] Therefore, the court concludes that Young's counsel (most specifically Edwards) acted unreasonably in regards to investigating and analyzing potential lay witness testimony along the lines of that introduced by witnesses such as Radford at the evidentiary hearing.

The final issue is whether Young was prejudiced by this failure to conduct further investigation. Young has not, on this record, established prejudice. Through the evidence presented at the evidentiary hearing, Young, in essence, contends that further investigation would have, and should have, uncovered the testimony (and related exhibits) of Radford, Willa Mae Young, and Randy Young. As discussed above, it is Young's position that this testimony and evidence could have done several valuable things to assist Young at trial.

First, Young contends that it could have rebutted the testimony of Donna Goss. (Docket

---

[3]Edwards did testify that he recalled, following the confession, visiting two of the banks, but he testified that he merely walked around the banks and drove around the relevant towns, looking for "anomalies." (Docket No. 217 at 332-33.)

24

No. 223 at 9-10.)  As discussed above, Goss testified that the individual in various bank surveillance photos appeared to be Young, because of his bowlegged "stance," his hands, his clothes, and the fact that he owned a pair of stained coveralls and a hat like those in the surveillance photos, among other things.  (Crim. Docket No. 53 at 259-65.)  Young contends that these witnesses could have challenged Goss's biased recollections that Young looked this way and owned these items.  (Docket No. 223 at 9-10.)

Young also claims that these witnesses and exhibits could have raised doubt as to Young's guilt in other ways.  That is, they could have challenged Young's ownership of certain other items depicted in various bank surveillance photos, such as the orange Tennessee Volunteers baseball hat, because, these witnesses claim, Young only wore hats with a horse emblem on them.  (*See Id.*)  Also, in light of the fact that a few bank tellers indicated that, from their fleeting glimpses, the robber was scruffy or not clean shaven, these witnesses could have raised doubt as to Young's culpability by presenting evidence and photographs from the time of the robberies, indicating that Young was clean shaven and well kempt.[4]  (*Id.*).

In its prior Memorandum, the court stated that, in light of the other evidence presented at trial, there was a fact issue as to prejudice, because "it is certainly reasonable to assume that three

---

[4]Young also contends that these photographs (and related testimony) could have been used in conjunction with several pre-trial witness statements to the FBI ("302 statements") that the Regions Bank robber had pronounced sideburns.  (Docket No. 223 at 8-9.)  The Government contends that this branch of the ineffective assistance of counsel claim was not alleged in the Petition and is, therefore, untimely.  (Docket No. 221 at 56.)  The court does not view this as a new claim, but, rather, consistent with the plaintiff's argument throughout these proceedings that further investigation into lay witnesses such as Radford would have developed lines of argument that the robber could not have been Young.  As is discussed herein, this broad argument is ultimately unpersuasive.

witnesses, all of whom were well acquainted with Young and who could speak about him positively and with knowledge, could have turned the tide in this case, particularly given the testimony that Young did not own a pair of coveralls like those depicted in the Regions Bank surveillance photo and that Young did not own an orange cap like that depicted in the Regions Bank photo. A reasonable fact-finder could conclude that, if this testimony had been presented, there is a 'reasonable probability' that the final result would have been different." (Docket No. 203 at 21.)

The evidentiary hearing, however, demonstrated that the testimony of these family members would not have been particularly convincing. Ms. Radford did appear to be somewhat in denial about the path that Young's life had taken in the time leading up to the robberies, and she was apparently unaware of major developments in his life, including his drug use, his gun ownership, and at least two sexual relationships. (Docket No. 216 at 113-116, 119-24.) Moreover, the broad and conclusory testimony from Radford, Randy Young and Willa Mae Young that Young was always "clean and neat" was belied by Young's appearance following the alleged kidnapping and by testimony, from Young himself, that Young was associating with unsavory characters who were involved in a seedy drug underworld.

In short, the testimony from these individuals that Young always kept a certain appearance and that they did not believe that Young owned certain articles of clothing would not have been particularly compelling in light of the testimony that indicated that, at least at the time of the relevant events, these family members had a reduced awareness of how Young was spending his time, the property he had, and the activities in which he was engaging.

26

Moreover, as was demonstrated at the evidentiary hearing, the proffered certitude from witnesses such as Radford about Young's conduct, manners and activities would have invited damaging testimony about Young's drug use, the alleged fake kidnapping and Young's financial difficulties. Indeed, from its review of the trial record, the court can detect little evidence of motive offered by the Government in the initial trial. As was demonstrated at the evidentiary hearing, however, the testimony of these individuals would have opened the door to testimony that Young was spending a substantial amount of money on crack cocaine, had mild financial troubles (including being late on loans), and, therefore, had a need to generate quick money. This inadvertent motive testimony would have been damaging to the defendant.

Moreover, while the photographs offered by Radford were compelling in that they showed an image of Young (around the time that the robberies were being committed) as a smiling and jovial family man, belying any sense that he was a drug abusing bank robber, they also would have provided the jury with an opportunity to closely examine Young's face and, based on the testimony at trial, that may not have been to Young's advantage. For instance, Melinda Kelly, a teller witness to the First Tennessee robbery testified that, through the robber's mask, she could detect that the robber had "real . . . thick and dark" eyebrows and "blue or green" eyes. (Crim. Docket No. 52 at 118.) From the photographs submitted at the evidentiary hearing, that description is consistent with Young. Judy Carney, also a teller witness to the First Tennessee robbery, testified that, through the mask, she could tell that the robber had "an extremely large nose." (Crim. Docket No. 53 at 147.) While "extremely large" is a relative term, Young, particularly viewing the photographs up close, does appear to have a substantially pronounced

27

nose.

Finally, as pointed out in the court's previous Memorandum, while the Government's case against Young may not have been a "slam dunk," there was considerable evidence adduced at trial that tied Young to these robberies, most notably the testimony of William Frensley, an FBI photographic evidence examiner, who testified that he compared the surveillance photos from the Regions Bank robbery to evidence recovered from Mr. Young's horse barn, and that he was able to determine that the coveralls worn by the Regions Bank robber were the same coveralls found in the horse barn, because they both had the same unique bleach stain. (Crim. Docket No. 54 at 420.)

In light of all of this, Young was not prejudiced by Edwards' failure to further investigate the lay witness testimony discussed above. Therefore, his ineffective assistance of counsel claim based on the failure to conduct further investigation fails.

## CONCLUSION

For the reasons discussed herein, the plaintiff's remaining *habeas* claim, based upon ineffective assistance of counsel, is ultimately unavailing, and, therefore, the plaintiff's Petition will be denied.[5]

An appropriate order will enter.

_____

ALETA A. TRAUGER
United States District Judge

---

[5]When the district court denies a ground for relief on the merits in a *habeas corpus* action, a Certificate of Appealability (COA) "may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), the standard being whether "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). In its prior Memorandum, the court declined to issue a COA as to those claims that the court dismissed, recognizing that such a ruling did not preclude the petitioner from seeking a COA from the Sixth Circuit as to those claims. (Docket No. 203 at 32) As to the remainder of the petitioner's ineffective assistance of counsel claim that is the subject of this opinion and attached Order, the court concludes that a COA should issue under this standard. *See Wilson v. U.S.*, 287 Fed. Appx. 490, 494 (6th Cir. 2008).